09 CV 8291

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

NOVEL COMMODITIES S.A.,                          :

                      Plaintiff,                    :          09 Civ. _____

    - against -                                  :

ARDEMAR MARINE LIMITED,                        :

                  Defendant.                    :

------------------------------------------------------------X

RECEIVED
SEP 30 2009
U.S.D.C. S.D. N.Y.
CASHIERS

## VERIFIED COMPLAINT

Plaintiff, NOVEL COMMODITIES S.A. ("Plaintiff"), by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint against the Defendant, ARDEMAR MARINE LIMITED ("Defendant") alleges, upon information and belief, as follows:

1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 United States Code § 1333.

2.     At all times material to this action, Plaintiff was, and still is, a foreign corporation, or other business entity organized and existing under the laws of Switzerland, with a principal place of business located at Geneva, Switzerland.

3.     Upon information and belief, Defendant was, and still is, a foreign corporation, or other business entity organized and existing under the laws of Greece, with a principal place of business located at Nicosia, Greece.

4.     At all material times, Defendant was the disponent owner of the motor vessel "MAKEEVKA" (hereinafter the "Vessel").

5.     At all material times, Plaintiff was the charterer of the Vessel.

6.      By a time charter party dated October 2, 2008 (the "Charter Party"), Plaintiff and Defendant agreed for charter of the Vessel from Defendant to Plaintiff for the carriage of bagged rice for "one Charter trip, of about 80 days without guarantee (basis present intention Hochiminh City to Cuba straight) via safe port(s) safe berth(s) safe anchorage(s) always afloat, always within Institute Warranty Limits, within countries possibly including but not limited to Vietnam/China/Thailand/India/Pakistan/East Africa/West Africa/Cuba, intention via Hochiminh city to West Africa and/or Cuba.  Charterers' option to trade Hochiminh city/Vietnam. Charterers' option to trade/redeliver vessel at Cuba." *See copy of Charter Party dated October 2, 2008 annexed hereto as Exhibit "1."*

7.      The Vessel loaded the cargo of bagged rice (the "Cargo") from Vietnam and the Cargo was fumigated upon completion of loading.

8.      The Vessel sailed from Vietnam and arrived at Havana, Cuba on or about December 6, 2008, where the Cargo was found to be infested with insects, and discharge of the Cargo was prohibited.

9.      In breach of the Charter Party, Defendant caused the Cargo to become damaged and infested by, including but not limited to, by failing to " be ready to receive cargo with clean swept holds and tight, staunch, strong, free of loose rust scale, free of smell infestation in all holds/tweendecks and in every way fitted for ordinary cargo service ..." thereby causing the Cargo to become infested with insects, causing damages to Plaintiff, which damages were reasonably foreseeable to the Defendant at the time it entered into the Charter Party with the Plaintiff. *See Exhibit "1" - Charter Party, Clause 2.*

10.      In further breach of the Charter Party, Defendant caused the Cargo to become damaged and infested by, including but not limited to, failing to "... maintain the Vessel's class

and keep her in a thoroughly efficient state in hull, machinery and equipment for and during the service …" thereby causing the Cargo to become infested with insects, causing damages to Plaintiff, which damages were reasonably foreseeable to the Defendant at the time it entered into the Charter Party with the Plaintiff. *See Exhibit "1" - Charter Party, Clause 6.*

11.    In further breach of the Charter Party, Defendant caused the Cargo to become damaged and infested by, including but not limited to, violating its Article III obligations under the Hague Rules and/or the Hague Visby Rules, thereby causing the Cargo to become infested with insects, causing damages to Plaintiff, which damages were reasonably foreseeable to the Defendant at the time it entered into the Charter Party with the Plaintiff. *See Exhibit "1" - Charter Party, Clause 31(a).*

12.    It was impossible to re-fumigate the Cargo at Havana, Cuba because of lack of facilities and, due to necessity, the Vessel sailed to Matanzas, Cuba to have the Cargo fumigated, which resulted in delay, causing damages to Plaintiff, which damages to Plaintiff were the result of Defendant's breach of the Charter Party and were reasonably foreseeable to the Defendant at the time it entered into the Charter Party with the Plaintiff.  Further or alternatively, the Vessel was off-hire on, and/or subsequent to, December 6, 2008, and Plaintiff was not required to pay hire and overtime, if any, for the time thereby lost. *See Exhibit "1" - Charter Party, Clause 17.*

13.    In further breach of the Charter Party, Defendant unreasonably stopped discharge of the Cargo at Havana, Cuba until Plaintiff's disputed deduction was paid into escrow, which resulted in delay, thereby causing damages to Plaintiff, which damages were reasonably foreseeable to the Defendant at the time it entered into the Charter Party with the Plaintiff.

14.     Due to and as a result of Defendant's breach of the Charter Party, Plaintiff has sustained damages in the principal amount of $351,001.09, exclusive of interest, arbitration costs and attorneys' fees. *See Breakdown of Claim annexed hereto as Exhibit "2."*

15.     Pursuant to the Charter Party, disputes arising thereunder are to be submitted to arbitration in London with English law to apply.

16.     Plaintiff is preparing to commence London arbitration proceedings against Defendant and will do so once jurisdiction is obtained over Defendant.

17.     Interest, costs and attorneys fees are routinely awarded to the prevailing party in London arbitration subject to English law.  As best as can now be estimated, Plaintiff expects to recover the following amounts as the prevailing party in the substantive proceedings:

| | | |
|---|---|---|
| A. | Principal claim:<br>Balance of Hire | $351,001.09 |
| B. | Interest on claim:<br>2 years at 5%, compounded quarterly | $36,621.96 |
| C. | Estimated recoverable attorney's fees and costs:<br>£70,000.00 = | $115,343.00 |
| **Total** | | **$502,966.05** |

18.     The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of one or more garnishees which are believed to be due and owing to the Defendant. *See Affidavit of Coleen A. McEvoy in Support of Maritime Attachment annexed hereto as Exhibit "3."*

19.    The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any assets of the Defendant held by the aforesaid garnishees for the purpose of obtaining personal jurisdiction over the Defendant, and to secure the Plaintiff's claims as described above.

**WHEREFORE**, Plaintiff prays:

A.    That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.    That pursuant to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38, Chapter Two of the Federal Arbitration Act ("FAA"), 9 United States Code §§ 201-208 and/or the doctrine of comity, this Court recognize and confirm any foreign judgment or arbitration award rendered on the claims had herein as a Judgment of this Court;

C.    That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds held by any garnishee within the District which are due and owing to the Defendant, in the amount of **$502,966.05** calculated to date to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

D.    That this Court enter judgment against Defendant on the claims set forth herein;

E.      That this Court retain jurisdiction over this matter through the entry of any

judgment or award associated with any of the claims currently pending, or which may be

initiated in the future, including any appeals thereof;

F.      That this Court award Plaintiff its attorney's fees and costs of this action; and

G.      That the Plaintiff have such other, further and different relief as the Court

may deem just and proper.

Dated: September 30, 2009

The Plaintiff,
NOVEL COMMODITIES S.A.

By: _____

Coleen A. McEvoy
Patrick F. Lennon
LENNON, MURPHY & LENNON, LLC
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 – phone
(212) 490-6070 – fax
cam@lenmur.com
pfl@lenmur.com

## ATTORNEY'S VERIFICATION

1.     My name is Coleen A. McEvoy.

2.     I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.     I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the Plaintiff.

4.     I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.     The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.     The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.     I am authorized to make this Verification on behalf of the Plaintiff.

Dated: September 30, 2009

_____
Coleen A. McEvoy

# EXHIBIT 1

Code Name "NYPE 93"
Recommended by:
The Baltic and International Maritime Council(BIMCO)
The Federation of National Associations of
Ship Brokers and Agents (FONASBA)

# TIME CHARTER©

## New York Produce Exchange Form
### Issued by the Association of Ship Brokers and Agents (U.S.A.), Inc.

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946;
Revised June 12th, 1981; September 14th 1993.

**THIS CHARTER PARTY**, made and concluded in *Croissy sur Seine*.................................................... 1
this *02nd*............................................... day of *October* ................................... ~~19~~ *2008* ................. 2

Between *ARDEMAR MARINE LIMITED - 24A, ARCHIMIDOUS STREET, ENGOMI, NICOSIA 2411,* 3
*GREECE* 4
*Disponent* **Owners** of the Vessel described ~~below~~ *as per Clause 64*, and *NOVEL COMMODITIES S.A. GENEVA* 5
.................................................................................................................................................................... 6
.................................................................................................................................................................... 7
**Charterers.** 8

**Description of Vessel** *(See Clause 64)* 9

Name *M/V " Makeevka "*..................................... Flag ......................................... Built ................................. (year). 10
Port and number of Registry ................................................................................................................................ 11
Classed ...................................................................................... in .................................................................... 12
Deadweight .........................................long*/metric* tons (cargo and bunkers, including freshwater and 13
stores not exceeding ........................................ long*/metric* tons) on a salt water draft of ............................ 14
on summer freeboard. 15
Capacity ................................................ cubic feet grain ............................................. cubic feet bale space. 16
Tonnage .............................................................................................................................................. GT/GRT. 17
*Average Service* Speed *which to be maintained throughout the currency of this charter-party* about knots, fully laden, 18
in good weather conditions up to and including maximum 18
Force ............. on the Beaufort wind scale, on a consumption of about .......................................... long*/metric* 19
tons of ................................................................................................................................................................ 20

\* *Delete as appropriate.* 21
*For further description see Appendix "A" (if applicable)* 22

**1. Duration** 23

The Owners agree to let and the Charterers agree to hire the Vessel from the time of delivery for ~~a period~~ 24
~~of~~ one Charter trip, *of about 80 days without guarantee (basis present intention Hochiminh City to Cuba straight) via* 25
*safe port(s) safe berth(s) safe anchorage(s) always afloat, always within Institute Warranty Limits, within countries* 25
*possibly including but not limited to Vietnam/China/Thailand /India/Pakistan/East Africa/West Africa/Cuba, intention* 25
*via Hochiminh city to West Africa and/or Cuba.* 26
*Charterers' option to trade Hochiminh City /Vietnam.* 27
*Charterers' option to trade/redeliver vessel at Cuba.* ................. within below mentioned trading limits *(see Clause 5).* 28

**2. Delivery** 29

The Vessel shall be placed at the disposal of the Charterers ~~at~~ *up on arrival at pilot station Hochiminh City any* 30
*time, day or night Sundays holidays included* . ................................................................................................ 30
*Owners confirm that vessel is off Vizag free of cargo, waiting for orders, and Owners warrant that upon fixing they will* 31
*instruct Master to proceed full steam direct to Hochiminh City without any stop en route even for bunkering, unless* 32
*otherwise mutually further agreed between Charterers and Owners. Estimate time of arrival Hochiminh City : 09th of* 33
*October 2008 all going well, weather permitting* . The Vessel on her delivery 33
shall be ready to receive cargo with clean-swept holds and tight, staunch, strong, *free of loose rust scale, free of* 34
*smell infestation in all holds/tweendecks* and in every way fitted 34
for ordinary cargo service, having water ballast and with sufficient power to operate all cargo-handling gear 35

simultaneously.                                                                                         36

The Owners shall give the Charterers not less than ............*1*.............................. days notice of expected date of     37
delivery.                                                                                              38
*Acceptance of delivery by Charterers shall not constitute any waiver of Owners' liabilities and obligations.*     38

**3.     On-Off Hire Survey** *(See Clauses 50 & 57)*                                                   39

~~Prior to delivery and redelivery the parties shall, unless otherwise agreed, each appoint surveyors, for their~~     40
~~respective accounts, who shall not later than at first loading port/last discharging port respectively, conduct~~     41
~~joint on hire/off hire surveys, for the purpose of ascertaining quantity of bunkers on board and the condition~~     42
~~of the Vessel. A single report shall be prepared on each occasion and signed by each surveyor, without~~     43
~~prejudice to his right to file a separate report setting forth items upon which the surveyors cannot agree.~~     44
~~If either party fails to have a representative attend the survey and sign the joint survey report, such party~~     45
~~shall nevertheless be bound for all purposes by the findings in any report prepared by the other party.~~     46
~~On hire survey shall be on Charterers' time and off hire survey on Owners' time.~~     47

**4.     Dangerous Cargo/Cargo Exclusions**                                                            48

(a) The Vessel shall be employed in carrying lawful merchandise excluding any goods of a dangerous,     49
injurious, flammable or corrosive nature unless carried in accordance with the requirements or     50
recommendations of the competent authorities of the country of the Vessel's registry and of ports of     51
shipment and discharge and of any intermediate countries or ports through whose waters the Vessel must     52
pass. Without prejudice to the generality of the foregoing, in addition the following are specifically     53
excluded: livestock of any description, arms, ammunition, explosives, nuclear and radioactive materials,     54
.................................................................................................................     55
.................................................................................................................     56
.................................................................................................................     57
.................................................................................................................     58

***ONLY BAGGED RICE TO BE CARRIED UNDER THIS CHARTER PARTY - SEE ALSO CLAUSE 66***     59
.................................................................................................................     60
.................................................................................................................     61
.................................................................................................................     62
.................................................................................................................     63
.................................................................................................................     64

~~(b)If IMO classified cargo is agreed to be carried, the amount of such cargo shall be limited to~~     65
~~.............................tons and the Charterers shall provide the Master with any evidence he may~~     66
~~reasonably require to show that the cargo is packaged, labelled, loaded and stowed in accordance with IMO~~     67
~~regulations, failing which the Master is entitled to refuse such cargo or, if already loaded, to unload it at~~     68
~~the Charterers' risk and expense.~~     69

**5.     Trading Limits**                                                                              70

The Vessel shall be employed in such lawful trades between *ice free* safe ports, ~~and~~ safe ~~places~~ *berth(s)*     71
*and safe anchorage(s) , always afloat world wide trading, always*     71
within *Institute Warranties Limits ,* ...............................................................................     72
....................................................................................................... excluding     73
*( see clause 61)*...........................................................................................     74
.................................................................................................................     75
....................................................................................... as the Charterers shall direct.     76

**6.     Owners to Provide**                                                                           77

The Owners shall provide and pay for the insurance of the Vessel, except as otherwise provided, and for     78
all provisions, cabin, deck, engine-room and other necessary stores, including boiler water; shall pay for     79
wages, consular shipping and discharging fees of the crew and charges for port services pertaining to the     80
crew; shall maintain the Vessel's class and keep her in a thoroughly efficient state in hull, machinery and     81
equipment for and during the service, and have a full complement of officers and crew.     82

**7.     Charterers to Provide**                                                                       83

The Charterers, while the Vessel is on hire, shall provide and pay for all the bunkers except as otherwise     84

agreed; shall pay for port charges (including compulsory watchmen and cargo watchmen and compulsory garbage disposal), all communication expenses pertaining to the Charterers' business at cost, pilotages, towages, agencies, commissions, consular charges (except those pertaining to individual crew members or flag of the Vessel), and all other usual expenses except those stated in Clause 6, but when the Vessel puts into a port for causes for which the Vessel is responsible (other than by stress of weather), then all such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew shall be for the Owners' account. Fumigations ordered because of cargoes carried or ports visited while the Vessel is employed under this Charter Party shall be for the Charterers' account *without crew being required to go ashore and vessel is to sail immediately after fumigants placed into holds. Master to follow fumigant Company instructions (see also Clause 56)*. All other fumigations shall be for the Charterers' account after the Vessel has been on charter for a continuous period of six months or more.  85 86 87 88 89 90 91 92 92 92 93 94

The Charterers shall provide and pay for necessary dunnage and also any extra fittings requisite for a special trade or unusual cargo, but the Owners shall allow them the use of any dunnage already aboard the Vessel. Prior to redelivery the Charterers shall remove their dunnage and fittings at their cost and in their time.  95 96 97 98

8.    **Performance of Voyages**  99

(a) The Master shall perform the voyages with due despatch, and shall render all customary assistance with the Vessel's crew. The Master shall be conversant with the English language and (although appointed by the Owners) shall be under the orders and directions of the Charterers as regards employment and agency; and the Charterers shall perform all cargo handling, including but not limited to loading, stowing, trimming, lashing, securing, dunnaging, unlashing, discharging, and tallying, at their risk and expense, under the supervision of the Master.  100 101 102 103 104 105

(b) If the Charterers shall have reasonable cause to be dissatisfied with the conduct of the Master or officers, the Owners shall, on receiving particulars of the complaint, investigate the same, and, if necessary *and reasonable practicable*, make a change in the appointments.  106 107 108

9.    **Bunkers**  109

(a) The Charterers on delivery, and the Owners on redelivery, shall take over and pay for all fuel and diesel oil remaining on board the Vessel as hereunder. The Vessel shall be delivered *at Hochiminh City* with:  110 111 111

*about 500* ..... ~~long\*~~/metric\* tons of *intermediate* fuel oil at the price of *USD 600,00 ( six hundred US dollars)* per ton; *about 65... metric* tons of *marine* diesel oil at the price of *USD 900,00 (nine hundred US dollars)* per ton. The vessel shall  112 113 113

be redelivered with: *about 500 metric* tons of *intermediate* fuel oil at the price of *USD 600,00 ( six hundred US dollars)* per ton;  114 114

*about 65 metric* ................... tons of *marine* diesel oil at the price of *USD 900,00 (nine hundred US dollars )* per ton.  115

~~\* Same tons apply throughout this clause.~~
*All bunkers supplied during this Time Charter must fulfill not only the content of Sulphur (not to exceed 4.5% m/m) but including sample methods/procedure on bunkers supplied as per Marpol Annex VI.*
*Charterers have option to supply RMF25 should RME25 is not available at bunkering port.*  116 116 116 116 116

(b) The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines and auxiliaries and which conform to the specification(s) as set out in ~~Appendix A~~ *Clause 64*.  117 118 118

The Owners reserve their right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the Vessel's engines or auxiliaries, the Owners shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker consumption, nor for any time lost and any other consequences.  119 120 121 122 123 124

10.    **Rate of Hire/Redelivery Areas and Notices**  125

The Charterers shall pay for the use and hire of the said Vessel at the rate of $ *15.000,00 ( fifteen thousand US*  126

*dollars)* ..................................................................................................................................... 126
U.S. currency, daily, ~~or $~~ *or pro rata, including overtime less commissions plus USD 60.000,00 ( sixty thousand us* 127
*dollars) gross ballast bonus payable with first hire payment* ~~U.S. currency per ton on the Vessel's total deadweight~~ 127
~~carrying capacity, including bunkers and stores, on~~ ....................................... ~~summer freeboard, per 30 days,~~ 128
commencing on and from the ~~day~~ *time* of her delivery, as aforesaid, and at and after the same rate for any part 129
of a ~~month~~ *day*; hire shall continue until the ~~hour of the day~~ *time* of her redelivery in like good order and condition, 130
ordinary wear and tear excepted, to the Owners (unless Vessel lost) *upon dropping last outward sea pilot, any time,* 131
*day or night, Sundays and holidays included* at Charterers' option : 131
*one safe port Cuba , Charterers being allowed to trade en route to East Africa or West Africa vessel being redelivered in* 131
*any case in West Africa or Cuba* ................................................................................................................... 131
*one safe port West Coast Africa , Charterers being allowed to trade en route to East Africa vessel being redelivered in* 132
*any case in West Africa or cuba* .................................................................................................................... 133
.................................................................................................. unless otherwise mutually agreed. 134

The Charterers shall give the Owners not less than *15/10/7 approximate* .................... days notice of the Vessel's 135
expected date and probable port of redelivery *and 5/3/2/1 definite day(s) notice of vessel's expected date and port of* 136
*redelivery.* 136

For the purpose of hire calculations, the times of delivery, redelivery or termination of charter shall be 137
adjusted to GMT. 138

**11.    Hire Payment** 139

(a)    *Payment* 140
140
*First hire, ballast bonus and bunkers to be paid on delivery.* 140

Payment of Hire shall be made so as to be received by the Owners or their designated payee in 141
*into Owners nominated bank full style as follow :* ~~viz~~ ................................................................................... 142
*Intermediary Bank: HSBC Bank USA (MRMDUS33)* ..................................................................................... 143
*ABA no. 021001088* 144
*Beneficiary Bank: Banque Invik S.A. Luxembourg* ....................................................................................... 144
*Swift code    INVKLULL* 144
*Beneficiary account IBAN:   LU14 1944 01004000 0 USD* 145
*Account Name: Ardemar Marine Limited* ~~in~~ 145
..................................................................... ~~currency, or~~ in United States Currency, in funds available to the 146
Owners on the due date, 15 days in advance, and for the last month or part of same the approximate 147
amount of hire, and should same not cover the actual time, hire shall be paid for the balance day by day 148
as it becomes due, if so required by the Owners. Failing the punctual and regular payment of the hire, 149
or on any fundamental breach whatsoever of this Charter Party, the Owners shall be at liberty to 150
withdraw the Vessel from the service of the Charterers without prejudice to any claims they (the Owners) 151
may otherwise have on the Charterers. 152

At any time after the expiry of the grace period provided in Sub-clause 11 (b) hereunder and while the 153
hire is outstanding, the Owners shall, without prejudice to the liberty to withdraw, be entitled to withhold 154
the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever 155
for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners, and hire 156
shall continue to accrue and any extra expenses resulting from such withholding shall be for the 157
Charterers' account. 158

(b)    *Grace Period* 159

Where there is failure to make punctual and regular payment of hire due to oversight, negligence, errors 160
or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners 161
*two*...................... clear banking days (as recognized at the agreed place of payment) written notice to rectify the 162
failure, and when so rectified within those *two* .................... days following the Owners' notice, the payment shall 163
stand as regular and punctual. 164

Failure by the Charterers to pay the hire within *two*........................... days of their receiving the Owners' notice as 165
provided herein, shall entitle the Owners to withdraw as set forth in Sub-clause 11 (a) above. 166
166
166

(c}    *Last Hire Payment*                                                                            167

Should the Vessel be on her voyage towards port of redelivery at the time the last ~~and/or the penultimate~~   168
*sufficient* payment of hire is/are due, said payment(s) is/are to be made for such length of time as the Owners   169
and                                                                                                  169
the Charterers may agree upon as being the estimated time necessary to complete the voyage, and taking   170
into account bunkers actually on board, to be taken over by the Owners and estimated disbursements for   171
the Owners' account before redelivery *but maximum USD 500 (five hundred US dollars) per port*. Should same not   172
cover the actual time, hire is to be paid for the                                                     172
balance, day by day, as it becomes due. When the Vessel has been redelivered, any difference is to be   173
refunded by the Owners or paid by the Charterers, as the case may be. *All accounts to be settled whithin*   174
*maximum 15 days after redelivery. See also line 178.*                                                174

(d)    *Cash Advances*                                                                               175

Cash for the Vessel's ordinary disbursements at any port may be advanced by the Charterers, as required   176
by the Owners, subject to 2 1/2 percent commission and such advances shall be deducted from the hire.   177
The Charterers, however, shall in no way be responsible for the application of such advances.          178
*If after 90 days vouchers are still awaited then the accounts are to be finalised on vouchers actually submitted. Owners*   178
*to refund on presentation to Charterers any amounts disbursed on Owners' behalf for which vouchers are submitted*   178
*after that time.*                                                                                    178
                                                                                                      178

## 12.    Berths                                                                                      179

The Vessel shall be loaded and discharged in any safe dock or at any safe berth or safe ~~place~~ *anchorage* that   180
Charterers or their agents may direct, provided the Vessel can safely enter, lie and depart always afloat   181
at any time of tide.                                                                                  182

## 13.    Spaces Available                                                                            183

(a)  The whole reach of the Vessel's holds, decks, and other cargo spaces (not more than she can   184
reasonably and safely stow and carry), also accommodations for supercargo, if carried, shall be at the   185
Charterers' disposal, reserving only proper and sufficient space for the Vessel's officers, crew, tackle,   186
apparel, furniture, provisions, stores and fuel.                                                      187

(b)  ~~In the event of deck cargo being carried, the Owners are to be and are hereby indemnified by the~~   188
~~Charterers for any loss and/or damage and/or liability of whatsoever nature caused to the Vessel as a~~   189
~~result of the carriage of deck cargo and which would not have arisen had deck cargo not been loaded~~ . *See*   190
*clause 66* .                                                                                         190

## 14.    Supercargo and Meals                                                                        191

The Charterers are entitled to appoint a supercargo, who shall accompany the Vessel at the Charterers'   192
risk and see that voyages are performed with due despatch. *If Charterers decide to embark a supercargo he is*   193
*to sign Owners' standard P&I form of waiver before embarking the vessel and wording to be as per Owners' attached*   193
*wording* He is to be furnished with free                                                             193
accommodation and same fare as provided for the Master's table, the Charterers paying at the rate of   194
*USD 10,00 ( ten us dollars)* per day. The Owners shall victual pilots and customs officers, and also, when   195
authorized by the Charterers or their agents, shall victual tally clerks, stevedore's foreman, etc.,   196
Charterers paying at the rate of *USD 6,00 ( six us dollars)* per meal for all such victualling. *See also Clause 58.*   197

## 15.    Sailing Orders and Logs                                                                     198

The Charterers shall furnish the Master from time to time with all requisite instructions and sailing   199
directions, in writing, in the Enqlish language, and the Master shall keep full and correct deck and engine   200
logs of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the   201
Charterers, their agents or supercargo, when required, with a true copy of such deck and engine logs,   202
showing the course of the Vessel, distance run and the consumption of bunkers. Any log extracts   203
required by the Charterers shall be in the English language.                                          204

## 16.    Delivery/Cancelling                                                                         205

If required by the Charterers, time shall not commence before *the 07th of October 2008 at 08:00 hours local time ...* and should the    206
    206
Vessel not be ready for delivery on or before *the 10th October 2008 ,* but not later than *24:00 ......* hours *local time,*    207
the Charterers shall have the option of cancelling this Charter Party. *In any case, notice for delivery not to be    208
tendered before being fully fixed and certificates approved.*    208

*Extension of Cancelling*    209

If the Owners warrant that, despite the exercise of due diligence by them, the Vessel will not be ready    210
for delivery by the cancelling date, and provided the Owners are able to state with reasonable certainty    211
the date on which the Vessel will be ready, they may, at the earliest seven days before the Vessel is    212
expected to ~~sail for the port or place of delivery~~ *be delivered,* require the Charterers to declare whether or not    213
they will    213
cancel the Charter Party. Should the Charterers elect not to cancel, or should they fail to reply within two    214
days or by the cancelling date, whichever shall first occur, then the seventh day after the expected date    215
of readiness for delivery as notified by the Owners shall replace the original cancelling date. Should the    216
Vessel be further delayed, the Owners shall be entitled to require further declarations of the Charterers    217
in accordance with this Clause.    218

**17.    Off Hire**    219

In the event of loss of time from deficiency and/or default and/or strike of officers or crew, or deficiency    220
of stores, fire, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the    221
arrest of the Vessel, (unless such arrest is caused by events for which the Charterers, their servants,    222
agents or subcontractors are responsible), or detention by average accidents to the Vessel or cargo unless    223
resulting from inherent vice, quality or defect of the cargo, drydocking for the purpose of examination or    224
painting bottom, or by any other similar cause preventing the full working of the Vessel *unless same caused by*    225
*Charterers and/or their servants,* the payment of    225
hire and overtime, if any, shall cease for the time thereby lost. Should the Vessel deviate or put back    226
during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident    227
to the cargo or where permitted in lines 257 to 258 hereunder, the hire is to be suspended from the time    228
of her deviating or putting back until she is again in the same or equidistant position from the destination    229
and the voyage resumed therefrom. All bunkers used by the Vessel while off hire shall be for the Owners'    230
account. In the event of the Vessel being driven into port or to anchorage through stress of weather,    231
trading to shallow harbors or to rivers or ports with bars, any detention of the Vessel and/or expenses    232
resulting from such detention shall be for the Charterers' account. If upon the voyage the speed be    233
reduced by defect in, or breakdown of, any part of her hull, machinery or equipment *unless same caused by*    234
*Charterers and/or their servants,* the time so lost, and    234
the cost of any extra bunkers consumed in consequence thereof, and all extra proven *direct* expenses may be    235
deducted from the hire.    236

**18.    Sublet**    237

Unless otherwise agreed, the Charterers shall have the liberty to sublet the Vessel for all or any part of    238
the time covered by this Charter Party, but the Charterers remain responsible for the fulfillment of this    239
Charter Party. *However, sublet Charterers to be guaranteed by Novel Commodities S.A. Geneva and shall be nominated*    240
*to owners in advance for approval*    240

**19.    Drydocking**    241

The Vessel was last drydocked *the 27th of April 2007.*...............................................................................    242

~~*(a) The Owners shall have the option to place the Vessel in drydock during the currency of this Charter~~    243
~~at a convenient time and place, to be mutually agreed upon between the Owners and the Charterers, for~~    244
~~bottom cleaning and painting and/or repair as required by class or dictated by circumstances.~~    245

*(b) Except in case of emergency no drydocking shall take place during the currency of this Charter    246
Party.    247

* *Delete as appropriate*    248

**20.  Total Loss**    249

Should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be returned to the Charterers at once.    250 251

**21.  Exceptions**    252

The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the seas, rivers, machinery, boilers, and navigation, and errors of navigation throughout this Charter, always mutually excepted.    253 254 255

**22.  Liberties**    256

The Vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property.    257 258

**23.  Liens**    259

The Owners shall have a lien upon all cargoes and all sub-freights and/or sub-hire for any amounts due under this Charter Party, including general average contributions, and the Charterers shall have a lien on the Vessel for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once.    260 261 262 263

The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien or encumbrance, which might have priority over the title and interest of the Owners in the Vessel. The Charterers undertake that during the period of this Charter Party, they will not procure any supplies or necessaries or services, including any port expenses and bunkers, on the credit of the Owners or in the Owners' time.    264 265 266 267

**24.  Salvage**    268

All derelicts and salvage shall be for the Owners' and the Charterers' equal benefit after deducting Owners' and Charterers' expenses and crew's proportion.    269 270

**25.  General Average**    271

General average shall be adjusted according to York-Antwerp Rules 1974, as amended ~~1990~~ *1994*, or any subsequent modification thereof, in **London** .................................... and settled in *US dollars* ................................ currency.    272 273 274

The Charterers shall procure that all bills of lading issued during the currency of the Charter Party will contain a provision to the effect that general average shall be adjusted according to York-Antwerp Rules 1974, as amended ~~1990~~ *1994*, or any subsequent modification thereof and will include the "New Jason Clause" as per Clause 31.    275 276 277 278

Time charter hire shall not contribute to general average.    279

**26.  Navigation**    280

Nothing herein stated is to be construed as a demise of the Vessel to the Time Charterers. The Owners shall remain responsible for the navigation of the Vessel, acts of pilots and tug boats, insurance, crew, and all other matters, same as when trading for their own account.    281 282 283

**27.  Cargo Claims**    284

*Eventual shortages/damaged cargo/*Cargo claims as between the Owners and the Charterers shall be settled in accordance with the Inter-Club    285 285
New York Produce Exchange Agreement of ~~February 1970~~ *1996*, ~~as amended May, 1984, or~~ *and* any subsequent    286 286
modification or replacement thereof.    287
*Charterers' P and I club RAETS CLUB*    287
*K.P Van der Mandelelaan 64-70*    287
*Rotterdam 3062 THE NETHERLANDS*    287
*Office phone:00 31 10 2425 007*    287

*Office Fax:  00 31 10 2425 052*  287
*EMail: a.lesuis@raetspandi.com*  287
*URL:  www.RaetsPandi.com*  287

**28.  Cargo Gear and Lights**  288

The Owners shall maintain the cargo handling gear of the Vessel which is as follows:  .......................................  289
............................................................................................................................................  290
............................................................................................................................................  291
............................................................................................................................................  292
providing gear (for all derricks or cranes) capable of lifting capacity as described. The Owners shall also  293
provide on the Vessel for night work lights as on board, but all additional lights over those on board shall  294
be at the Charterers' expense. The Charterers shall have the use of any gear on board the Vessel. If  295
required by the Charterers, the Vessel shall work night and day and all cargo handling gear shall be at the  296
Charterers' disposal during loading and discharging. In the event of disabled cargo handling gear, or  297
insufficient power to operate the same, the Vessel is to be considered to be off hire *prorate basis* to the extent  298
that  298
time is actually lost to the Charterers and the Owners to pay stevedore stand-by charges occasioned  299
thereby *for maximum one shift as far as cost of stevedores standby is concerned*, unless such disablement or  300
insufficiency of power is caused by the Charterers' stevedores. If  300
required by the Charterers, the Owners shall bear the cost of hiring shore gear in lieu thereof, *subject to Owners'*  301
*prior approval of costs* in which  301
case the Vessel shall remain on hire.  302

**29.  Crew Overtime**  303

In lieu of any overtime payments to officers and crew for work ordered by the Charterers or their agents,  304
the Charterers shall pay the Owners, concurrently with the hire ............................................. per month  305
or pro rata.  306

**30.  Bills of Lading**  307
*Vessel only to load cargo for which "CLEAN ON BOARD" Bills of Lading can be issued. "CLEAN" Mate's receipt to*  307
*be issued at the end of each loading period and surrendered to Shippers'Agents.*  307
307
*All cargo shipped to be in good conditions, if some bags proven to be damaged or torn before loading operations, same*  307
*to be mutually ascertained by both parties, Master having the right to reject such stained/damaged/torn bags that would*  307
*involve clausing of Bills of Lading, and respective damaged bags to be replaced by sound bags at Charterers'/time and*  307
*expense. If any rebagging is required due to above condition, same to be for Shippers'/Charterers' expense and vessel to*  307
*remain on hire.*  307
307
*Bills of lading to be signed as presented but in strict conformity with mate's receipt by 'Master' only, a per Owners'*  307
*authority, or by loading port agents to sign Bills of Lading as per Master's authority' but always in strict confirmity with*  307
*mate's receipt."*  307
307
*All Bills of Lading issued under this Charter Party shall be deemed to incorporate all terms/conditions/exceptions and*  307
*clauses including arbitration clause of this Charter*  307
307

(a) The Master shall sign the bills of lading or waybills for cargo as presented in conformity with mates  308
or tally clerk's receipts. However, the Charterers may sign bills of lading or waybills on behalf of the  309
Master, with the Owner's prior written authority, always in conformity with mates or tally clerk's receipts.  310

(b) All bills of lading or waybills shall be without prejudice to this Charter Party and the Charterers shall  311
indemnify the Owners against all consequences or liabilities which may arise from any inconsistency  312
between this Charter Party and any bills of lading or waybills signed by the Charterers or by the Master  313
at their request.  314

(c) Bills of lading covering deck cargo shall be claused: "Shipped on deck at Charterers', Shippers' and  315
Receivers' risk, expense and responsibility, without liability on the part of the Vessel, or her Owners for  316
any loss, damage, expense or delay howsoever caused."  317
317
*All Bills of Lading to be expressively governed by English Law and to incorporate the charter-party.*  317

34.  **Protective Clauses**                                                                        318

This Charter Party is subject to the following clauses all of which are also to be included in all bills of    319
lading ~~or waybills~~ issued hereunder:                                                              320

(a)    CLAUSE PARAMOUNT                                                                             321
"This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the    322
United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national    323
legislation as may mandatorily apply by virtue of origin or destination of the bills of lading, which shall    324
be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the    325
carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said    326
applicable Act. If any term of this bill of lading be repugnant to said applicable Act to any extent, such    327
term shall be void to that extent, but no further."                                                     328

and                                                                                                 329

(b)    BOTH-TO-BLAME COLLISION CLAUSE                                                               330
"If the ship comes into collision with another ship as a result of the negligence of the other ship and any    331
act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in    332
the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against    333
all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents    334
loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other    335
or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the    336
other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.    337

The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or    338
objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or    339
contact."                                                                                           340

and                                                                                                 341

(c)    NEW JASON CLAUSE                                                                             342
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage    343
resulting from any cause whatsoever, whether due to negligence or not, for which, or for the    344
consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods,    345
shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the    346
payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred,    347
and shall pay salvage and special charges incurred in respect of the goods.    348

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship    349
or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover    350
the estimated contribution of the goods and any salvage and special charges thereon shall, if required,    351
be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery."    352

and                                                                                                 353

~~(d)    U.S. TRADE - DRUG CLAUSE~~                                                                 354
~~"In pursuance of the provisions of the U.S. Anti-Drug Abuse Act 1986 or any re-enactment thereof, the~~    355
~~Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested~~    356
~~narcotic drugs and marijuana to be loaded or concealed on board the Vessel.~~    357

~~Non-compliance with the provisions of this clause shall amount to breach of warranty for consequences~~    358
~~of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel~~    359
~~harmless and shall keep them indemnified against all claims whatsoever which may arise and be made~~    360
~~against them individually or jointly. Furthermore, all time lost and all expenses incurred, including fines,~~    361
~~as a result of the Charterers' breach of the provisions of this clause shall be for the Charterer's account~~    362
~~and the Vessel shall remain on hire.~~    363

~~Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this~~    364
~~clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable~~    365
~~time the Vessel is released and at their expense put up the bails to secure release of the Vessel.~~    366

~~The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the~~    367

~~event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the~~   368
~~Vessel's personnel."~~   369

and   370

(e)   ~~WAR CLAUSES~~ *(BIMCO CONWAR TIME CLAUSE 2004 as attached to apply)*   371
~~"(i) No contraband of war shall be shipped. The Vessel shall not be required, without the consent of the~~   372
~~Owners, which shall not be unreasonably withheld, to enter any port or zone which is involved in a state~~   373
~~of war, warlike operations, or hostilities, civil strife, insurrection or piracy whether there be a declaration~~   374
~~of war or not, where the Vessel, cargo or crew might reasonably be expected to be subject to capture,~~   375
~~seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de~~   376
~~facto authority or any purported governmental organization maintaining naval, military or air forces).~~   377

~~(ii) If such consent is given by the Owners, the Charterers will pay the provable additional cost of insuring~~   378
~~the Vessel against hull war risks in an amount equal to the value under her ordinary hull policy but not~~   379
~~exceeding a valuation of ...................................................In addition, the Owners may purchase and the~~   380
~~Charterers will pay for war risk insurance on ancillary risks such as loss of hire, freight disbursements,~~   381
~~total loss, blocking and trapping, etc. If such insurance is not obtainable commercially or through a~~   382
~~government program, the Vessel shall not be required to enter or remain at any such port or zone.~~   383

~~(iii) In the event of the existence of the conditions described in (i) subsequent to the date of this Charter,~~   384
~~or while the Vessel is on-hire under this Charter, the Charterers shall, in respect of voyages to any such~~   385
~~port or zone assume the provable additional cost of wages and insurance properly incurred in connection~~   386
~~with master, officers and crew as a consequence of such war, warlike operations or hostilities.~~   387

~~(iv) Any war bonus to officers and crew due to the Vessel's trading or cargo carried shall be for the~~   388
~~Charterers' account."~~   389

## 32.   War Cancellation   390

In the event of the outbreak of war (whether there be a declaration of war or not) between any two or   391
more of the following countries: ...............................................................................................................   392
......................................................................................................................................................................   393
......................................................................................................................................................................   394
......................................................................................................................................................................   395
either the Owners or the Charterers may cancel this Charter Party. Whereupon, the Charterers shall   396
redeliver the Vessel to the Owners in accordance with Clause 10; if she has cargo on board, after   397
discharge thereof at destination, or, if debarred under this Clause from reaching or entering it, at a near   398
open and safe port as directed by the Owners; or, if she has no cargo on board, at the port at which she   399
then is; or, if at sea, at a near open and safe port as directed by the Owners. In all cases hire shall   400
continue to be paid in accordance with Clause 11 and except as aforesaid all other provisions of this   401
Charter Party shall apply until redelivery.   402

## 33.   Ice   403

The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area   404
where lights or lightships have been or are about to be withdrawn by reason of ice, nor where there is   405
risk that in the ordinary course of things the Vessel will not be able on account of ice to safely enter and   406
remain in the port or area or to get out after having completed loading or discharging. Subject to the   407
Owners' prior approval the Vessel is to follow ice-breakers when reasonably required with regard to her   408
size, construction and ice class.   409
   409
   409

## 34.   Requisition   410

Should the Vessel be requisitioned by the government of the Vessel's flag during the period of this Charter   411
Party, the Vessel shall be deemed to be off hire during the period of such requisition, and any hire paid   412
by the said government in respect of such requisition period shall be retained by the Owners. The period   413
during which the Vessel is on requisition to the said government shall count as part of the period provided   414
for in this Charter Party.   415

If the period of requisition exceeds ...................................................... months, either party shall have the option   416

of cancelling this Charter Party and no consequential claim may be made by either party.    417

**35.    Stevedore Damage**    418

Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all    419
damage to the Vessel caused by stevedores provided the Master has notified the Charterers and/or their    420
agents in writing as soon as practical but not later than *24 48* hours after any damage is discovered *and has also*    421
*held stevedores responsible or parties responsible for damage in writing and has entered such damage in log's book.*    421
Such    421
notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent    422
of such damage.    423

(a)    In case of any and all damage(s) affecting the Vessel's seaworthiness/*class* and/or the safety of the crew    424
and/or affecting the trading capabilities of the Vessel, the Charterers shall immediately arrange for repairs    425
of such damage(s) at their expense and the Vessel is to remain on hire until such repairs are completed    426
and if required passed by the Vessel's classification society.    427

(b)    Any and all damage(s) not described under point (a) above shall be repaired at the Charterers' option,    428
before or after redelivery concurrently with the Owners' work. In such case no hire and/or expenses will    429
be paid to the Owners except and insofar as the time and/or the expenses required for the repairs for    430
which the Charterers are responsible, exceed the time and/or expenses necessary to carry out the    431
Owners' work.    432

**36.    Cleaning of Holds**    433

~~The Charterers shall provide and pay extra for sweeping and/or washing and/or cleaning of holds between~~    434
~~voyages and/or between cargoes provided such work can be undertaken by the crew and is permitted by~~    435
~~local regulations, at the rate of...................................................................................................................................per hold.~~    436

~~In connection with any such operation, the Owners shall not be responsible if the Vessel's holds are not~~    437
accepted or passed by the port or any other authority. The Charterers shall have the option to re-deliver    438
the Vessel with unclean/unswept holds against a lumpsum payment of *USD 3.000,00 (three thousand US dollars)*    439
in lieu of cleaning, *including removal/disposal of dunnage failing Charterers to redeliver the vessel swept-clean.*    439

**37.    Taxes**    440
*All taxes and/or dues on vessel and/or cargo and/or hire or sub-hire and freights and/or sub-freights arising out of*    440
*cargoes carried or ports visited under this Charter Party shall be for Charterers' account for this voyage/fixture and*    440
*Owners' own banking charges/dues shall remain for Owners' account.*    440

~~Charterers to pay all local, State, National taxes and/or dues assessed on the Vessel or the Owners~~    441
~~resulting from the Charterers' orders herein, whether assessed during or after the currency of this Charter~~    442
~~Party including any taxes and/or dues on cargo and/or freights and/or sub-freights and/or hire (excluding~~    443
~~taxes levied by the country of the flag of the Vessel or the Owners).~~    444

**38.    ~~Charterers' Colors~~**    445

~~The Charterers shall have the privilege of flying their own house flag and painting the Vessel with their~~    446
~~own markings. The Vessel shall be repainted in the Owners' colors before termination of the Charter~~    447
~~Party. Cost and time of painting, maintaining and repainting those changes effected by the Charterers~~    448
~~shall be for Charterers' account.~~    449

**39.    Laid Up Returns**    450

The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their    451
underwriters as and when received from underwriters by reason of the Vessel being in port for a minimum    452
period of 30 days if on full hire for this period or pro rata for the time actually on hire.    453

**40.    Documentation**    454

The Owners shall provide any documentation relating to the Vessel that may be required to permit the    455
Vessel to trade within the agreed trade limits, including, but not limited to certificates of financial    456
responsibility for oil pollution, provided such oil pollution certificates are obtainable from the Owners'    457

P. & I. club, valid international tonnage certificate, Suez and Panama tonnage certificates, valid certificate of registry and certificates relating to the strength and/or serviceability of the Vessel's gear.  458
459

**41.   Stowaways**  460

(a)   (i)   The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers.  461
462
463

(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account and the Vessel shall remain on hire.  464
465
466
467
468
469
470

(iii) Should the Vessel be arrested as a result of the Charterers' breach of charter according to sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.  471
472
473
474

(b)   (i)   If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Owners' account and the Vessel shall be off hire.  475
476
477
478

(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.  479
480
481
482

**42.   Smuggling**  483

In the event of smuggling by the Master, Officers and/or crew, the Owners shall bear the cost of any fines, taxes, or imposts levied and the Vessel shall be off hire for any time lost as a result thereof.  484
485

**43.   Commissions**  486

A commission of *1.25*...... percent is payable by the Vessel and the Owners to *PELAGOS SARL/Croissy sur Seine, deductible by Charterers from each hire payment, plus 1.25 percent to Zodiac Navigation S.A/Piraeus*.  487
488
.................................................................................................................................................................  489
.................................................................................................................................................................  490
on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.  491

**44.   Address Commission**  492

An address commission of *2.50*................................. percent is payable to *NOVEL COMMODITIES S.A., Geneva*  493
.................................................................................................................................................................  494
.................................................................................................................................................................  495
.................................................................................... on hire earned and paid under this Charter.  496

**45.   Arbitration**  497

~~(a)   NEW YORK~~  498
~~All disputes arising out of this contract shall be arbitrated at New York in the following manner, and~~  499
~~subject to U.S. Law:~~  500

~~One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their~~  501
~~decision or that of any two of them shall be final, and for the purpose of enforcing any award, this~~  502
~~agreement may be made a rule of the court. The Arbitrators shall be commercial men, conversant with~~  503

~~shipping matters. Such Arbitration is to be conducted in accordance with the rules of the Society of Maritime Arbitrators Inc.~~

504
505

~~For disputes where the total amount claimed by either party does not exceed US $ ......................................** the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators Inc.~~

506
507
508

(b)    LONDON

All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in Shipping, one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. No award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as above, unless objection to his action be taken before the award is made. Any dispute arising hereunder shall be governed by English Law.

509
510
511
512
513
514
515
516

For disputes where the total amount claimed by either party does not exceed US $ *50.000* ...............................** the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators Association *but see attached amended LMAA FALCA Arbitraton Clause which to apply*.

517
518
519

~~* Delete para (a) or (b) as appropriate~~

520

~~** Where no figure is supplied in the blank space this provision only shall be void but the other provisions of this clause shall have full force and remain in effect.~~

521
522

If mutually agreed, clauses *46* .......................... to *66* ........................, both inclusive, as attached hereto are fully incorporated in this Charter Party.

523
524

This Charter Party is a computer generated copy of the "NYPE 93" form printed by authority of the Association of Ship Brokers & Agents (USA), Inc., using software which is the copyright of Strategic Software Ltd. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of this document which is not clearly visible, the text of the original ASBA approved document shall apply. The Association of Ship Brokers and Agents (USA), Inc. and Strategic Software Ltd. assume no responsibility for any loss or damage caused as a result of any discrepancies between the original approved document and this document.

**APPENDIX "A"**

To Charter Party dated *02nd of October 2008* ........................................................................... 526

Between *ARDEMAR MARINE LIMITED - 24A, ARCHIMIDOUS STREET, ENGOMI, NICOSIA 2411, GREECE* 527

*Disponent* Owners 527

and *NOVEL COMMODITIES S.A., GENEVA* ......................................................... Charterers 528

**Further details of the Vessel:** *M/V " Makeevka " (see Clause 64)* ........................................... 529

.............................................................................................................................. 530

**ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
THE M/V "MAKEEVKA " DATED CROISSY SUR SEINE,
THE 02ND OF OCTOBER 2008**

**Clause 46.-    MASTER AND CREW ASSISTANCE AND SERVICES**

With reference to Clause n° 8 of this charter-party, customary assistance shall mean all types of work and services included in the hire which the Master and the crew would normally do when the ship is trading for the Owners' account, if permitted by local regulations, such as, but not limited to:

A.    Raising and lowering of cranes and/or gangways in preparation for loading and discharging,

B.    Opening and closing of hatches in connection with loading and discharging, provided local regulations permitted,

C.    Closing and opening of hatches in the event of weather which may adversely affect condition of cargo carried on board during loading and discharging, provided local regulations permitted,

D.    Supervision for loading and discharging and everything related thereto,

E.    Maintaining sufficient electric power on all cranes whilst loading and discharging,

F.    Shifting vessel and ballasting/deballasting, during loading and discharging and shifting berth(s),

G.    Berthing and unberthing in connection with loading and unloading cargo and/or bunkering,

H.    Necessary assistance in the vessel's bunkering operation,

I.    All garbage removal/disposal, if not compulsory, custom and/or excise duties on ship's store to be for Owners' account,

J.    Warping alongside berths whenever required.

The Master shall be responsible for the safe keeping of all gear, equipment and/or stores supplied to the vessel by or for Charterers' account and the Master shall keep a record of all such gear, equipment. Such gear equipment and/or stores to be redelivered to the Charterers prior to redelivery of the vessel to the Owners or if required by the Charterers at any time if practical during the charter at Charterers' expense and time in like good order and condition as supplied, fair wear and tear always excepted.

**Clause 47.-    INSURANCE FOR HULL AND MACHINERY**

Owners warrant that the vessel is covered by a reputable First Class insurance for hull and machinery and shall remain fully insured throughout the terms of the charter.

Hull and machinery value = USD 11.000.000,00
Insurance Company/Underwriters: ASKA UKRAINE, REINSURERS INGOSSTRAKH RUSSIA

As long as the vessel is on hire to Charterers, Charterers to have the benefit of any return insurance premium receivable by Owners from their Underwriters (as and when received from Underwriters) after expiry of the relevant Policy Year by reason of the vessel being in port for minimum period of thirty (30) days qualifying for such returns.

ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
THE M/V "MAKEEVKA" DATED CROISSY SUR SEINE,
THE 02ND OF OCTOBER 2008

**Clause 48.-    SPEED AND CONSUMPTIONS**

The Owners stipulate that the vessel is capable of maintaining and shall remain capable of maintaining throughout the period of this charter-party on all sea passages from seabuoy to seabuoy with wind upto and including force 4 as per Beaufort scale (speed shall be determined by taking the total hours at sea as shown in the log books) speeds and daily consumptions as described in Clause 64. The period during which the vessel performs under the following conditions shall be excluded from performance calculations:

1. Any time during which speed is deliberately reduced to comply with Charterers' orders/requirements.

2. Any time during which the vessel's speed is deliberately reduced for reason of safety while navigating within narrow waters having due regard to vessel's size and draft or when assisting a vessel in distress or when saving life or property,

3. Any completed sea passage of less than twelve (12) hours.

Unpremeditated stops, not due to weather and sea conditions at sea, and/or Charterers'/their servants' fault, shall be counted as off-hire in full and shall be excluded from total hours at sea when calculating the average speed.

**Clause 49.-    RELEASE OF CARGO WITHOUT BILL OF LADING**

Charterers will endeavour to collect all relevant original Bill of Lading for presentation at discharge port. However, should the Bill of Lading originals not arrive in time then Owners agree to discharge the cargo if so required by Charterers against Charterers providing Owners with a Letter of Indemnity in usual P&I club format signed by Charterers only. The Letter of Indemnity to be always accompanied by respective Bill of Lading copies.
Charterers to send copy of original Letter of Indemnity via broking channel to enable starting of discharge but original to follow by post immediately.
As per original printed text of all congenbill upon Charterers surrendering to Owners 1 out of 3 original Bill of Lading duly accomplished then 2 other ones shall be null and void. Therefore upon Charterers surrending of 1 out of 3 original Bills of Lading duly accomplished to Owners then Letter of Indemnity to become null and void and to be returned to Charterers by Owners.

**Clause 49bis.-**No liner or through or transhipment or combined transport and no way bill are Bill of Lading to be issued under this charter-party.

**Clause 50.-    JOINT ON-HIRE/OFF-HIRE BUNKER SURVEY**

On-Hire bunker survey to be held at the first loading port, no off-hire to be charged to Owners unless the survey interrupts Charterers' operations.
Off-Hire bunker survey to be held at redelivery port at Charterers' time.

**ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
THE M/V "MAKEEVKA " DATED CROISSY SUR SEINE,
THE 02ND OF OCTOBER 2008**

*.... Continue of Clause 50*

For on/off-hire survey, the parties shall each appoint surveyors for their respective account.

Owners have the privilege to appoint Master/Chief Engineer as their surveyor who shall conduct joint 'on-hire' and 'off-hire' survey.

A single report shall be prepared and signed by each surveyor without prejudice to his right to file a separate report setting forth item(s) upon which the surveyors cannot agreed .

Delivery time and redelivery time to be local, but converted to GMT for means of calculation of on-hire time.

**Clause 51.-   DOUBLE BANKING**

Charterers may carry out lightening/discharge or top-off operation with vessel's holds ready for same, at their risk and expense by causing other vessel to be double-banked against vessel, provided such action is carried out at a customary and safe place where such operations normally take place for vessels of similar size and type and the operations are carried out to Master's satisfaction. Charterers will supply fenders and/or tugboat, pilot at Charterers' expense for the operation if necessary, however fenders on board to be made available by vessel. Any additional insurance premium payable for the operation to be reimbursed by Charterers against supporting vouchers on Owners' Underwriters' letterhead sent by Owners by fax with next hire payment, but amount of such insurance premium shall not exceed Lloyd's London's prevailing rate. Original invoice shall follow by mail.

If, at any time during the operation, the Master considers it unsafe to continue the operation, Master may order the other vessel to cast off and move away. It is understood that the Master will always act reasonably in this respect.

Master and crew to render ail customary assistance to carry out these activities as though carrying out for their own account.

**Clause 52.-   HAMBURG RULES**

Neither the Charterers nor their agents shall permit the issue of any Bill of Lading or other document evidencing a contract of carriage (whether or not signed on behalf of the Owners or on the Charterers' behalf or on behalf of any sub-Charterers) incorporating, where not compulsorily applicable, the Hamburg rules or any other legislation imposing liability in excess of Hague or Hague/Visby rules. The Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this Clause.

**Clause 53.-   TALLY**

Irrespective of the supervision of weight ordered by the Shippers, the Owners are allowed to instruct/employ a suitable supervising Company or their P+I surveyor at loading port, who in conjunction with Master, carry out, at Owners' expenses, weight control and tally during loading.

**ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
THE M/V "MAKEEVKA " DATED CROISSY SUR SEINE,
THE 02ND OF OCTOBER 2008**

*…Continue from Clause 53*

In case there is a dispute between Owners' Surveyor and Shippers tally an independent survey to be held by an independent Surveyor appointed both by Owners and Charterers whose findings shall be final and binding upon both parties i.e. Owners and Charterers - the cost of the survey to be shared equally.

**Clause 54.-    WAR RISK PREMIUM**

Basic extra war risk insurance premium cover for world wide trading and trading the countries/ports agreed as per present Charter Party to be for Owners' account.

However, any additional war risk premium on vessel's hull and machinery value for trading the countries/ports agreed as per present Charter Party charged after date of fixture to be for Charterers' account upon presentation of underwriters' duly signed original invoice on letter head paper.

However such additional war risk premium not to exceed Lloyds of London's scale/tariff.

Charterers to reimburse the Owners the additional premium with the next hire payment following receipt of the invoice and supporting vouchers on Owners' Underwriters brokers' letterhead featuring rebates, if any, granted to Owners by fax. Originals are to follow by mail.

**Clause 55. -    CHANGING BILLS OF LADING**

All shipping documents shall be issued, marked with the discharging region in compliance with the Charter Party trading area.

Otherwise discharging at the port out of regions stated in Charter Party trading area are subject to additional "SOL" (ship's owner liability) terms , insurance.

Bills of lading reissue to change quantity distribution or change destination provided strictly in compliance with Charter Party trading area and in conformity with actual discharge port/area of the vessel, or change consignee strictly as per below last paragraph are allowed provided initial set marked "null void", produced to owner. The Charterers to submit respective Letter of Indemnity in Owners P&I format. In which case new set(s) of bills of lading will be issued at Croissy sur Seine (PELAGOS S.AR.L) . The Owner shall be responsible for total quantity only.

New set(s) of bills of lading and subsequent amendments to be faxed to Owners for approval before releasing it but Owners not to unreasonably withhold/delay their approval . Once Owners have approved draft of new Bills of Lading the initial complete set of original bills of lading to be surrendered, stamped "cancelled" and returned to the Owners simultaneously with the release of new sets of Bills of Lading issued strictly as per drafts approved by Owners. Charterers warrant that at no time whatsoever 2 valid sets of Bills of Lading for same cargo shall be simultaneously in circulation.

Charterers hereby undertake and guarantee to hold Owners and /or master harmless from any liability arising from and to indemnify Owners for all costs and consequences as a result of Charterers acting within the above mentioned

4

**ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
THE M/V "MAKEEVKA " DATED CROISSY SUR SEINE,
THE 02ND OF OCTOBER 2008**

..... *Continue of Clause 55*
authority.

If so required by Owners, Charterers to issue Letter of Indemnity  as per usual P&I club wording signed by Charterers only.

Charterers to send copy of original Letter of Indemnity via broking channel to enable issuance of new Bills of Lading without delay but original to follow by post immediately as per original printed text of all Congenbill upon Charterers surrendering to Owners 1 out of 3 original Bill of  Lading duly accomplished then 2 other ones shall be null and void. Therefore upon Charterers serenading of 1 out of 3 original Bill of Lading duly accomplished to Owners then Letter of Indemnity to become null and void and to be returned to  Charterers by Owners.

Any bill of lading  reissue in view of  change  consignee are subject to Charterers providing Owners with letter of authorization to do so from previous consignee or subject to Charterers providing Owners copy Bill of Lading showing same have been endorsed by old consignee in favour of new consignee. its understood any case   all originals  initial set to follow  to owner immediately.

Respective Charterers Letter of Indemnity to be produced to indemnify the owner from consequences.

Charterers to send copy of original Letter of Indemnity via broking channel to enable issuance of  but original Bill of Lading to follow by post immediately. As per original printed text of all Congenbill upon Charterers surrendering to Owners 1 out of 3 original Bill of Lading duly accomplished then 2 other ones shall be null and void. Therefore upon Charterers surrending of 1 out of 3 original Bill of Lading  duly accomplished to Owners then Letter of Indemnity to become null and void and to be returned to Charterers by Owners.

## Clause 56.- FUMIGATION

Fumigation to be effected on the vessel by the Charterers after the completion of loading and at Charterers' expenses.

Vessel to sail immediately once fumigation is placed on board, subject to local regulations, and hatches are closed against a letter issued by the Master of the carrying vessel confirming that hatches are closed for minimum 72 hours at sea at Owners'/Master's own risk.

Owner/Master certify that vessel is in all respects capable and agreeable to "in transit fumigation" with aluminium phosphine/fostoxin or any other approved product. Charterers confirm that aluminium phosphine/fostoxin or any other approved product will be harmless to the crew provided crew follows strictly the fumigation procedure and safety instructions which will be provided to Master by fumigation company prior vessel's sailing.

Master to be fully imparted of fumigation method employed and Master to confirm understanding & compliance with all safety precautions as provided with by Fumigation Company.

Master not to clause Bills of Lading for the reason of such fumigation and/or for reasons of insects having been detected in the cargo prior such fumigation.

Charterers confirm that fumigant/chemicals to comply with international sanitary regulations.

**ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF**
**THE M/V "MAKEEVKA " DATED CROISSY SUR SEINE,**
**THE 02ND OF OCTOBER 2008**

**Clause 57.- <u>CONDITION SURVEY</u>**
Charterers to have the option to carry out a condition survey including hose test. Owners    to rectify deficiencies if any as per surveyors' recommendations. If hose test        carried is out then same to be prior to commencement of loading's operation and in       Charterers' time and at their expenses but time/expenses to rectify defficiencies to be    for Owners account.

**Clause 58.-    <u>REPRESENTATION EXPENSES</u>**
A lumpsum of USD 1.200 ( one thousand US dollars) per 30 days' month or pro rata to be paid to Owners for cost        of communication/victualling/entertainment expenses as per clause 14.

**Clause 59.-    <u>I.S.M. CLAUSE</u>**
From the date of coming into force of the International Safety Management (ISM)   code in relation to the vessel and thereafter during the currency of this charter-party, the Owners shall procure that both the vessel and "the Company" (as defined by the ISM code) shall comply with the requirements of the ISM code. Upon request the Owners shall provide a copy of the relevant Document Of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

**Clause 60.- <u>ISPS CLAUSE FOR TIME CHARTER-PARTIES</u>**

(a)  (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter-Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).
      (ii) Except as otherwise provided in this Charter-Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b)     (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter-Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter-Party contain the following provision :

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter-party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".
      (ii) Except as otherwise provided in this Charter-Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

6

ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
THE M/V "MAKEEVKA " DATED CROISSY SUR SEINE,
THE 02ND OF OCTOBER 2008

*.....Continue of Clause 60*

(c) Notwithstanding anything else contained in this Charter-Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

### Clause 61.-    **TRADING EXCLUSIONS**

Albania, Angola, Cabinda, Namibia, Liberia, Nigeria, Sierra Leone, Benin, Israel, Iraq, Turkish part of Cyprus, Turkey, USA , Canada, Syria, Sweden, Finland, Norway, direct trading between china and Taiwan, Australia, New Zeeland, North Korea and war zones-as to war exclusions to  be as per London hull and P&I war risks underwriters current exclusion list being in force.

The Charterers have no right to operate the vessel within war risks zones without having Owners confirmation / permission in writing and paying additional premium in accordance with rate and terms set out by Owners underwriters.

If Owners agree to call Vietnam or North and South Yemen or Djibouti for discharge then Charterers to absorb 100% of any shortage claims.

### Clause 62.

Charterers' designated Underwriters local representative to be allowed to board the vessel with a view to carrying out a pre-inspection/condition survey and a hose test survey prior loading with cost of same being for Charterers' account.  Such pre-inspection / condition survey is to be at reasonable standard for loading bagged cargo with consideration of vessel's age and other particulars as described. In the event that vessel fails the pre-inspection/condition survey/hose test survey then Owners to immediately arrange necessary repairs and time consumed and expenses for such operations to be for Owners' account.

### Clause 63.

Charterers shall have the option of supplying Ocean Routes or Applied Weather Technology advice to Master during the voyage(s). The Master shall comply with the reporting procedure of the routing service. The vessel shall be capable of steaming at all times in good weather during the currency of this Charter-Party as described. For the purpose of this Charter-Party "good weather conditions" shall be defined as weather conditions in winds not exceeding Beaufort scale 4 and Douglas sea state 3. Evidence of weather reports to be taken from ship's deck log and Ocean Routes or Applied Weather Technology.

In the event of consistent discrepancy between the deck logs and/or dispute over an apparent breach of the speed and consumption warranty of this Charter-Party, the performance data ( which is calculated based deck logs reports) supplied by Ocean Routes or Applied Weather Technology shall be taken as binding on both parties.

### Clause 64.    **VESSEL'S DESCRIPTION**
(STRICTLY AS PER OWNERS' INITIAL INDICATION) :
==========

7

**ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF**
**THE M/V "MAKEEVKA " DATED CROISSY SUR SEINE,**
**THE 02ND OF OCTOBER 2008**

```
…. Continue of Clause 64
    NAME, EX NAMES        :    MAKEEVKA EX WORLD SHANGHAI
    TYPE                  :    BULK CARRIER
    CLASS                 :    RMR KM* BULK
    OFFICIAL REGISTER NO.:     20
    REGISTER NO.          :    812583
    IMO no                :    8101927
    YARD AND YEAR BUILT   :    GANGAN SHIPBUILDING YARD, CHINA, 10
                               JUNE 1982
    FLAG, HOMEPORT        :    UKRAINE, MARIUPOL
    GRT/NRT INTERNATIONAL:     17989 / 10667
            PANAMA CANAL  :    19116 / 15438 ( ISSUED 17.10.94 )
            SUEZ CANAL    :    18153.61 / 14913.89 (ISSUED 17.02.86 )
    CALL SIGN, TELEX NO.  :    U V A E , INMARSAT C 427284810 UVAE X
    LOA, LBP, BEAM        :    196.47 / 183.00 / 23.00 M
    DEPTH MOULDED         :    14.30 M
DWAT IN METRIC TONS:
        TROPICAL : 28958 / 10.45
        SUMMER   : 28160 / 10.24
        WINTER   : 27317 / 10.02
        FRESHWATER ALLOWANCE ON SUMMER MARKS : 232 MM
        TPC       :    38.61
TYPE OF HATCH COVERS:    MCGREGOR TYPE
NUMBER AND SIZES OF HATCHES
            L   /   B
        NO.1   17.5 X 11.0
        NO.2   21.58 X 11.0
        NO.3   13.28 X 11.0
        NO.4   21.58 X 11.0
        NO.5   17.43 X 11.0


NUMBER AND SIZES OF HOLDS
            L              B                 H
        NO.1   27.85 X  8.00/22.00        13,4
        NO.2   31.54 X     22.00          12,6
        NO.3   21.58 X     23.00          12,6
        NO.4   31.54 X     23.00          12,6
        N0.5   28.22 X     22.40 / 7.20   12,6


CUBIC CAPACITIES ARE ALL CLEAR AND AVAILABLE FOR CARGO,
        INCLUDING HATCHCOAMING SPACE:


                CBM.   GRAIN / BALE
            NO.1       6761  / 6518
            NO.2       8205  / 7951
            NO.3       5595  / 5421
            NO.4       8204  / 7949
            NO.5       6700  / 6472
            --------------------------
            TTL        35465 / 34311


WING TANKS HOLD NO.2     2 X 594
             NO.3     2 X 406
```

**ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
THE M/V "MAKEEVKA" DATED CROISSY SUR SEINE,
THE 02ND OF OCTOBER 2008**

*… Continue of Clause 64*

```
                NO.4    2 X 594
                NO.5    2 X 481

MAXIMUM UNIFORM LOAD ON TANKTOP:
ON DECK AREA NR.1/2/4/5 : 17MT/M2
ON DECK 3.HOLDS : 23.1 MT/M2
ON HATCHCOVERS:  2.2 MT/M2
ON MAIN DECK : 2.75 MT/M2


FULL SPEED AND CONSUMPTION
LADEN    ABT  12,0 KNT ON ABT IFO 180 21 MTS PLUS ABT 2,2 MDO
BALLAST ABT  12,5 KNT ON ABT IFO 180 21 MTS PLUS ABT 2,2 MDO


IN GOOD WEATHER CONDITIONS UP TO WIND FORCE 4 OF BEAUFORT SCALE
AND SEASTATE 3 OF DOUGLAS SCALE.


VESSEL BURNS MDO WHEN MANEUVERING, WHEN STEAMING IN CONFINED WATER.


BUNKER CONSUMPTION IN PORT PER 24 HOURS:
    WORKING      2.5 MT MDO    +   1 MTS    IFO PD
    IDLE         1.8 MT MDO    +   1 MTS    IFO PD

BUNKER FUEL CAPACITIES        :       IFO - 1354.1 MTS
                                      MDO -  238.6 MTS


CARGO GEAR
   NUMBER              - 4 CARGO HYDRAULIC CRANES
   CAPACITY            - 25 T
STATE WHERE SITUATED - NO.1 BETWEEN HLDS 1-2
                       NO.2  -  "  -      2-3
                       NO.3  -  "  -      3-4
                       NO.4  _  "  -      4-5
                       CRANES NOS.1-3         CRANES NOS.2-4
     MAX.OUTSWING      - 20  M AT 25 DGRS     22 M AT 25 DGS
     MIN               - 4.5 M AT 78.5 DGS    4.5 M AT 78.39 DGS


WATER BALLAST TANK CAPACITY : 10877 CBM - 11148.9 MTS
WATER BALLAST HOLD(S) CAPACITY:
BALLASTING CAPACITY       :       550 M CUB / HOUR (FACT 500 )
DEBALLASTING CAPACITY     :       550 M CUB / HOUR
MAIN ENGINE.
MAKE AND TYPE:MITSUI ENG.& SH.BUILD.
B&W 8L55GCA (D) DIESSEL ENGINE
MAX CONTINUOUS OUTPUT   : 10700 BHP
VESSEL'S CONSTANTS : 500 MTS
VESSEL'S FW ON DELIVERY : 30
FW TANK CAPACITY        : 288


-Vessel to be highest class at ''R.M.R.S'' a member of IACS.
IACS without any outstanding class recommendation or condition
imposed that may affect of this voyage and fully P&I covered with
all current premia paid and is not subject to any know breach of
club rules at ''BRITISH MARINE LUXEMBOURG'' in any case a member of
```

9

### ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
### THE M/V "MAKEEVKA " DATED CROISSY SUR SEINE,
### THE 02ND OF OCTOBER 2008

*…. Continue of Clause 64*

the international groups of P&I club association all during whole performance of the Charter party. for class, P&I club, ISM (DOC+SMC), ISPS, cargo gears.
Owners' to send valid/updated certificates prior fixing.


-Owners warrant that vessel can be loaded and discharged simultaneously by minimum 4 gangs (provided same are being made available by Charterers) at all time with ship's own gears, and that all of vessel's hatches can be served by at least one gear.


-Owners warrant 25 000,00 metric tons DWCC basis 9,70 meters SWAD Cuba subject to bunker management and Owners warrant that in any case vessel's DWCC basis 9,70 meters SWAD Cuba to be minimum 24.300,00 metric tons.
-Vessel's DWT repeat DWT basis 9,70 meters SWAD Cuba : 26 000,00 metric tons.
-On draft 9,70 meters :
Displacement 34 000,00 metric tons
DWT   26.000,00 metric tons
DWCC  25.000,00 metric tons

QUESTIONNAIRE:
-Vessel's call sign : U V A E
-Vessel's telex / FAX / E-MAIL : INM C 427284810 UVAE
-Vessel's TPC : 38.61
-Vessel's WLTTOHC :
   IN BALLAST
   HATCH 1 - 11.30 M.
   HATCH 2 - 11.01 M.
   HATCH 3 - 10.75 M.
   HATCH 4 - 10.49 M.
   HATCH 5 - 10.20 M.
-Type of hatchcovers : 4 CARGO HYDRAULIC CRANES
-Owners confirm that vessel has no twinhatches .
-Owners confirm that holds / hatchways are free of any obstruction
-Owners confirm that vessel has no centerline bulkheads or beam
-Owners confirm that holds are steel floored
-Owners confirm that vessel suitable for grab discharge : CONFIRM
-List of vessels belonging to same Owners : 36 VESSELS
 http://www.cfd.com.ua/
-Last cargo discharge and eventual quantity R.O.B :
 Urea / empty
-Owners undertake keep Charterers very closely posted of vessel's position and inform them right away of any change in estimated time of  arrival at loading port failing which all proven damages to for Owners account
-Owners confirm vessel ISPS certified state date place certification
 NR 32 2 015 04 , issued at KYIV.
-Service speed: 12 KNT
-Owners confirm vessel is under continuous survey hull-engine-gear.
 dates of expiry these certificates : 22.04.2012
-Owners confirm vessel has not suffered any G/A or accident during last two years.
-Last port control survey and findings :07.07.08 Panjang, last

10

**ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF**
**THE M/V "MAKEEVKA " DATED CROISSY SUR SEINE,**
**THE 02ND OF OCTOBER 2008**

…. *Continue of Clause 64*

```
MOU 10.05.08 St.Petersburg . no detention, findings
-Owners confirm vessel has not been seized or arrested during last
two years
-Owners confirm that hatches are watertight and rubber gaskets are
in good condition .
-Actual full style, legal address, fax, phone, e-mail, telex of
Owners whom to appear as Charterers' counter-part on Charter Party
if vessel is not on T/C and whom to appear on the BLS and their
managers together with names of responsible PIC :
HEAD OWNER
COMMERCIAL FLEET OF DONBASS,
89,LUNINA AVE., MARIUPOL, UKRAINE, 87510

-Disponent Owners / Carrier for CHARTER PARTY / freight beneficiary
ARDEMAR MARINE LIMITED
24A, ARCHIMIDOUS STREET,
ENGOMI, NICOSIA 2411,

MANAGER
"CFD SHIPPING" LTD
 89,LUNINA AVE., MARIUPOL,
 UKRAINE, 87510

-Actual full style, legal address, fax, phone, telex, e-mail of
 TC Owners whom to appear as Charterers' counter part in Charter
Party and their managers together with names of responsible PIC :
NIL

-Has any bank a mortgage on vessel and is freight /receivables
assigned to this bank ? if so,state full address phone tlx fax and
name of person in charge of this mortgagee bank : nil
-ISM ISPS clause as per Bimco wording to apply
-Owners confirm vessel is suitable in all respects for the intended
cargo.
-Hull and machinery insured with : ASKA UKRAINE , REINSURERS
 INGOSSTRAKH RUSSIA
 insured value: USD 11 000 000,00
-Collision insurance insured with: BRITISH MARINE LUXEMBOURG
                    value: USD 500 000,00
-Upon request Owners to furnish written confirmation by the hull and
 machinery underwriters respectively the collision insurance under
 writers.
-Last drydock:            where: China    when: 27.04.2007
 Last special survey:     where: China    when: 07.05.2007
 Last hose test                     where:               when:
-IMO number :8101927
-Casuality and pollution  history: nil
 collisions, groundings, pollution, (oil/bunker spills and others)
 fire, cargo damage etc. over last 2 years:
-Last port state control inspection:
 where: 07.07.08  when: Panjang
 Problems if any : nil
 Vessel passed without recommendation or detention .
-Last 4 cargoes and Charterers:
```

**ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
THE M/V "MAKEEVKA " DATED CROISSY SUR SEINE,
THE 02ND OF OCTOBER 2008**

```
.... Continue of Clause 64
    1.   Urea       / Transammonia
    2.   Iron ore   / SW shipping
    3.   Mop        / Bpc
    4.   Alumina  / oldendorff

-Agents name and contact details for vessels last port: nil
```

END QUESTIONNAIRE

**Clause 65.**
Master to provide Charterers with stowage plan upon request.

**Clause 66. CARGO EXCLUSIONS**
Only bagged rice to be carried under this Charter Party.
No deck Cargo to be allowed under this Charter Party.

\* \* \*

## LMAA FALCA CLAUSE + 12 Months Time Bar

This contract is governed by English Law and all disputes arising under or in connection with it shall be referred to arbitration in London. The arbitration shall be conducted in accordance with one of the following LMAA procedures:

i)        where the amount claimed by the claimants is less than USD 50.000,00 (fifty thousand US dollars) excluding interest (or such other sum as the parties may agree) the reference shall be to a sole arbitrator and the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure ;

ii)       in any case where the LMAA procedures referred to above do not apply the reference shall be to three arbitrators (one to be appointed by each of the parties and the third by the arbitrators so chosen) in accordance with LMAA Terms in force at the relevant time.

Time Bar:
Disputes shall be referred to arbitration latest twelve months after completion of discharge, failing which such submission shall be time barred and shall be considered as null and void.

ococococococ

**ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
THE M/V "MAKEEVKA " DATED CROISSY SUR SEINE,
THE 02ND OF OCTOBER 2008**

## CONWARTIME 2004

(a)    For the purpose of this Clause, the words:

"Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii)    "War Risks" shall include any actual, threatened or reported:

war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or  ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b)    The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c)    The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents' right of search and/or confiscation.

(d)    (i)    The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

(ii)    If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e)    If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed

**ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
THE M/V "MAKEEVKA" DATED CROISSY SUR SEINE,
THE 02ND OF OCTOBER 2008**

to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f)    The Vessel shall have liberty:

(i)    to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v)    to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g)    If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without    first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h)    If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

******************

**Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005**

(a)    Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

**ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
THE M/V "MAKEEVKA " DATED CROISSY SUR SEINE,
THE 02ND OF OCTOBER 2008**

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b)  Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i)  the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

(ii)  the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c)  For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

*******************

**ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
THE M/V "MAKEEVKA " DATED CROISSY SUR SEINE,
THE 02ND OF OCTOBER 2008**

## AUTHORISATION TO SIGN BILLS OF LADING

MV ...................
PORT OF ...............
DATE .................
TO MESSRS .............

+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++

You are authorised to sign on my behalf BILLS OF LADING for cargo actually loaded onboard at the port of ............................. during present voyage and call only.

+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++

This authority, as well as any other authorization for signing Bills of lading on Master's or Owner's behalf wether expressly or implied is issued subject the following condition:

1. No Bill of lading may be issued which is ante-dated or post date or for goods that have not actually been placed on board.

2. All Bills of lading will be in english language and enrarely without prejudice to the Charter Party, booking note.

3. All Bills of lading signed by you, as presented must conform with the quantities, descriptions, and remarks of mate's receipts and any addendum thereto to be considered as incorporated herein, which must be presented to Master for signature before issue and sing of Bills of lading.

4. No duplicate original Bills of lading is to be issued to such person(s) or in such manner as to create risk of delivery of the goods to persons not entitled to take delivery of same.

5. Bills of lading to be in accordance with and subject all terms and clauses, conditions, exceptions and liberties emanating from the clauses of the governing Charter Party and same to be stated on the Bills of Lading.

6. If nature of cargo(s) required. "Quality and Quantity unknown" to be stated in bills of lading.

7. No Bill of lading may be issued if it contravenes the National Municipal laws of the port of loading and of the port of discharging or impose on the vessel or to Owners any liabilities duties or obligations greater than those undertaken by master's signature on the Bills of lading.

8. In case freight paid of freight prepaid bills of lading are to be issued same must not be released without written authorization from the time Charterers when vessel under time charter or from Owners when vessel in voyage charter.

**ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
THE M/V "MAKEEVKA " DATED CROISSY SUR SEINE,
THE 02ND OF OCTOBER 2008**

9.  No alteration will be made without prior consent of the Master and the Owners.

10. This authorization may be withdrawn or amended at any time in accordance with written and signed agreement that may be made hereafter between Owners and Master and Charterers.

11. Bills of lading not in conformity with the above stipulations from 1 to 11 shall be deemed unauthorized and not binding the vessel or Master or Owners.

CONFIRMING RECEIPT / ACCEPTANCE OF TERMS AND CONDITIONS AS PER ABOVE

AGENTS SIGNATURE                                   MASTER'S SIGNATURE
( agents stamp)                                    ( ship's stamp)

DATE :

# EXHIBIT 2

## Vessel:    M/V Makeevka V8106R

C/P date:            02.10.2008
Broker:        Pelagos
Daily rate:        $15'000.00 usd/pdpr
Owners:        Ardemar Marine Limited, Nicosia, Greece

Delivery:        09.10.2008 07:30        gmt
Hire Paid        17.01.2009 06:54        gmt

|  |  |  | 13.9750 | Days Hire |  |
|---|---|---|---|---|---|

| **Total Hire** |  |  | 99.9750 | days | **$1'499'625.00** |
|---|---|---|---|---|---|

### 1) Loss of time  /  Cgo found infested at Havana

| from | 07.12.2008 10:30 | LT |  |  |  |
|---|---|---|---|---|---|
| till | 09.12.2008 19:00 | LT |  |  |  |
| Total |  |  | 2.3542 | days | -$35'312.50 |
| C/V/E |  |  | 2.3542 | days | -$94.17 |
| Extra Port D/A |  | € 2'235.72 |  |  | -$3'018.22 |
| Bunkers consumption IFO as per cp |  | 1.00 MT/day | 2.3542 | days | -$1'412.50 |
| Bunkers consumption MGO as per cp |  | 1.80 MT/day | 2.3542 | days | -$3'813.75 |

### 2) Loss of time  /  sailing fm Havana to Matanzas for Fumigation

| from | 09.12.2008 19:00 | LT |  |  |  |
|---|---|---|---|---|---|
| till | 10.12.2008 01:30 | LT |  |  |  |
| Total |  |  | 0.2708 | days | -$4'062.50 |
| Cable and entertainment adjustment |  |  | 0.2708 | days | -$10.83 |
| Bunkers consumption IFO as per cp |  | 21.00 MT/day | 0.2708 | days | -$3'412.50 |
| Bunkers consumption MGO as per cp |  | 2.20 MT/day | 0.2708 | days | -$536.25 |

### 3) Loss of time / Cgo fumigation  at  Matanzas

| from | 10.12.2008 01:30 | LT |  |  |  |
|---|---|---|---|---|---|
| till | 20.12.2008 23:15 | LT |  |  |  |
| Total |  |  | 10.9063 | days | -$163'593.75 |
| Cable and entertainment adjustment |  |  | 10.9063 | days | -$436.25 |
| Extra Port D/A |  |  |  |  | -$29'386.32 |
| Bunkers consumption IFO as per cp |  | 1.00 MT/day | 10.9063 | days | -$6'543.75 |
| Bunkers consumption MGO as per cp |  | 1.80 MT/day | 10.9063 | days | -$17'668.13 |

### 4) Loss of time  /  sailing fm Matanzas back to Havana for discharging

| from | 20.12.2008 23:15 | LT |  |  |  |
|---|---|---|---|---|---|
| till | 21.12.2008 03:30 | LT |  |  |  |
| Total |  |  | 0.1771 | days | -$2'656.25 |
| Cable and entertainment adjustment |  |  | 0.1771 | days | -$7.08 |
| Bunkers consumption IFO as per cp |  | 21.00 MT/day | 0.1771 | days | -$2'231.25 |
| Bunkers consumption MGO as per cp |  | 2.20 MT/day | 0.1771 | days | -$350.63 |

### 5) Loss of time / Disch stopped by owners at Havana

| from | 09.01.2009 11:25 | LT |  |  |  |
|---|---|---|---|---|---|
| till | 14.01.2009 08:10 | LT |  |  |  |
| Total |  |  | 4.8646 | days | -$72'968.75 |
| Cable and entertainment adjustment |  |  | 4.8646 | days | -$194.58 |
| Extra Port D/A |  | € 5'911.40 |  |  | -$7'980.39 |
| Bunkers consumption IFO as per cp |  | 1.00 MT/day | 4.8646 | days | -$2'918.75 |
| Bunkers consumption MGO as per cp |  | 1.80 MT/day | 4.8646 | days | -$7'880.63 |

Less
Address Commission                                          2.50%          -$30'525.78
Brokerage                                                   2.50%          -$30'525.78

Bunkers on board at time of delivery as per bunkers survey report

| IFO | 550.644 mt | $600.00 usd/mt | $330'386.40 |
| MDO | 60.817 mt | $900.00 usd/mt | $54'735.30 |

Bunkers on board at time of redelivery

| IFO | 625.500 mt | $600.00 usd/mt | -$375'300.00 |
| MDO | 64.400 mt | $900.00 usd/mt | -$57'960.00 |

**Owner's expenses at Panama**

| Remittance to agents | | | -$3'485.00 |
| Handling fee | | 2.50% | -$87.13 |

**Owner's expenses at Havana > Approved on 04 Dec 2008**

| Remittance to agents | € 2'631.79 | | -$3'421.33 |
| Handling fee | | 2.50% | -$85.53 |

| Tally at HCMC > To be shared 50/50 as per agreement on 07.10.2008 | $2'952.00 | -$1'476.00 |

| ILOHC | $3'000.00 |
Cables and entertainment                   $1'200.00 usd/per month        $3'999.00

Amount paid:  By > BCV          14-oct-08 1st                     -$654'995.70
              By > BCV          24-oct-08 2nd                     -$214'350.00
              By > BCV          7-nov-09 3rd                      -$100'738.30
              By > BCV          12-déc-08 4th                     -$171'657.41
              By > BCV          24-déc-08 5th                     -$100'030.00
              By > BCV          14-janv-09                        -$131'619.11
                                6th          FINAL                      $0.00
                                                                        $0.00

Balance in Owns favour:                                           **-$351'001.09**

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
NOVEL COMMODITIES S.A.,                          :          09 CV _____
                                                 :
                        Plaintiff,               :          ECF CASE
                                                 :
        - against -                              :
                                                 :
ARDEMAR MARINE LIMITED,                           :
                                                 :
                        Defendant.               :
----------------------------------------------------------X

## AFFIDAVIT IN SUPPORT OF PRAYER FOR MARITIME ATTACHMENT

State of Connecticut    )
                        )          ss: SOUTHPORT
County of Fairfield     )

        Coleen A. McEvoy, being duly sworn, deposes and says:

        1.      I am a member of the Bar of this Court and represent the Plaintiff herein.  I am

familiar with the facts of this case and make this Affidavit in support of Plaintiff's prayer for the

issuance of a Writ of Maritime Attachment and Garnishment, pursuant to Rule B of the

Supplemental Admiralty Rules of the Federal Rules of Civil Procedure.

## DEFENDANT IS NOT PRESENT IN THE SOUTHERN DISTRICT OF NEW YORK

        2.      I have attempted to locate the Defendant ARDEMAR MARINE LIMITED within

the Southern District of New York (hereinafter "SDNY").  As part of my investigation to locate

the Defendant within the SDNY, I checked the telephone company information directory, as well

as the white and yellow pages for New York listed on the Internet or World Wide Web, and did

not find any listing for the Defendant.  Finally, I checked the New York State Department of

Corporations' online database which showed no listings or registration for the Defendant.

3.    I submit based on the foregoing that the Defendant cannot be found within the SDNY within the meaning of Rule B of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions ("Rule B").

## DEFENDANT'S PROPERTY MAY BE FOUND IN THE SDNY

4.    Upon information and belief, and also based upon payments made by the Plaintiff to the Defendant under the involved contracts which were sent by way of electronic funds transfers routed through New York intermediary banks, the Defendant has, or will have during the pendency of this action, tangible and intangible property as the same is defined under Rule B within the SDNY and subject to the jurisdiction of this Court, held in the hands of garnishees within the SDNY, which are believed to be due and owing to the Defendant.

5.    In support of its belief that Defendants will have assets within the SDNY and subject to the court's jurisdiction, Plaintiffs directs this Court's attention to the attached wire remittance details, attached hereto as Exhibit 1, which reflect payments made by the Defendant in U.S. dollars via New York.

6.    Upon information and belief, in the case of payments made by foreign parties, the vast majority of electronic funds transfers in U.S. dollars pass through banking/financial intermediaries located within the SDNY.

7.    Upon information and belief, Defendant has ongoing contractual obligations, or has had such obligations, that require it to make send / receive payments in U.S. dollars.  Thus, the likelihood that the Defendant will send / receive future payments through one of the banks named in Schedule "A" to the proposed ORDER DIRECTING CLERK TO ISSUE PROCESS OF MARITIME ATTACHMENT AND GARNISHMENT AND APPOINTING PROCESS SERVER is high and satisfies the reasonable belief threshold.  The garnishee banks listed are

limited to ones who regularly act as "intermediary banks" to effect wire transfers in U.S. dollars between a foreign originating bank and a foreign beneficiary bank.

## PRAYER FOR RELIEF FOR ORDER ALLOWING SPECIAL PROCESS SERVER

8.     Plaintiff seeks an Order pursuant to Rule 4(c) of the Federal Rules of Civil Procedure, for an Order appointing Patrick F. Lennon, Kevin J. Lennon, Charles E. Murphy, Nancy R. Peterson, Coleen A. McEvoy, Anne C. LeVasseur, Darin L. Callahan or any other partner, associate, paralegal or agent of Lennon, Murphy & Lennon, LLC, or any process server employed by Gotham Process Servers, in addition to the United States Marshal, to serve the Ex Parte Order and Process of Maritime Attachment and Garnishment, together with any interrogatories, upon the garnishee(s), together with any other garnishee(s) who (based upon information developed subsequent hereto by the Plaintiff) may hold assets of, for or on account of, the Defendant.

9.     Plaintiff seeks to serve the prayed for Process of Maritime Attachment and Garnishment with all deliberate speed so that it may be fully protected against the potential of being unable to satisfy a judgment/award ultimately obtained by Plaintiff and entered against the Defendant.

10.     To the extent that this application for an Order appointing a special process server with respect to this attachment and garnishment does not involve a restraint of physical property, it is submitted that there is no sound reason to require that the service be effected by the Marshal as it involves simple delivery of the Process of Maritime Attachment and Garnishment to the various garnishees to be identified in the writ and the required use of a Marshal will cause delay, additional expense and provide no benefit in respect of the purpose for which Plaintiff has filed this action.

## PRAYER FOR RELIEF TO SERVE LATER IDENTIFIED GARNISHEES

11.    Plaintiff also respectfully requests that the Court grant it leave to serve any additional garnishee(s) who may, upon information and belief obtained in the course of this litigation, to be holding, or believed to be holding, property of the Defendants, within the SDNY. Obtaining leave of Court at this time to serve any later identified garnishees will allow for prompt service of the Process of Maritime Attachment and Garnishment without the need to present to the Court amended Process seeking simply to identify other garnishee(s).

## PRAYER FOR RELIEF TO DEEM SERVICE CONTINUOUS

12.    Further, in order to avoid the need to repetitively serve the garnishees/banks, Plaintiff respectfully seeks further leave of the Court, as set out in the proposed Ex Parte Order for Process of Maritime Attachment, for any process that is served on a garnishee to be deemed effective and continuous service of process throughout any given day on which process is served and throughout the next day, provided that process is served the next day, and to authorize service of process via facsimile or e-mail following initial *in personam* service.

13.    Several garnishee banks, including, but not limited to, J.P. Morgan Chase, BNP Paribas, Societe Generale, have refused to consent to deem service of Rule B Orders and Writs continuous which will necessitate parties to serve these garnishees numerous times throughout any given day.  In seeking an Ex Parte Order deeming service continuous the Plaintiff relies on the holding on *DNSD Subsea AS v. Oceanografia, S.A. de CV*, 569 F. Supp. 2d 339, 347 (S.D.N.Y. 2008) which, in upholding the propriety of an Ex Parte Order which deemed service continuous, stated as follows:

> Clearly, the goal of the continuous service provision contained in the order signed by Judge Karas in this case and by Judge Scheindlin in *Ulisses* was *not* to undermine the Second Circuit's prohibition on the attachment of after-acquired

4

property announced in *Reibor*.  Rather, the continuous service provision 'was intended to avoid the absurdity, security problems, and inconvenience of requiring the garnishee banks to accept service repeatedly throughout the day.' *Ulisses, 415 F. Supp. 2d at 328*.  Indeed, the absence of such a continuous service provision – either by court order or by consent from the garnishees – would inevitably result in the posting of lawyers and/or process servers at bank offices around the clock in an attempt to capture EFTs at the precise moment of their arrival.  Defendant's narrow reading of *Reibor*, would, in effect, overrule the Second Circuit's later holding in *Winter Storm* – something the Second Circuit expressly declined to do in *Aqua Stoli* -- by making it virtually impossible to attach EFTs in Rule B cases.

14.    The Courts within the Southern District of New York have an interest in preserving the efficacy of the Ex Parte Orders issued therein.  As a result, and in order to give effect to the Rule B relief requested herein, the Plaintiff request that the Court issue an Ex Parte Order deeming service continuous.

Dated: September 30, 2009

_____
Coleen A. McEvoy

Sworn and subscribed to before me
this 30th day of September, 2009

_____
Notary Public/Commissioner of the Superior Court

Mary E. Fedorchak
Notary Public-Connecticut
My Commission Expires
November 30, 2011

5